## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARANDA JOHNSON,

       *Plaintiff*,

CASE NO. 14-cv-14713

DISTRICT JUDGE STEPHEN J. MURPHY

*v.*

MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 10, 11)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Johnson is not disabled. Accordingly, **IT IS RECOMMENDED** that Johnson's Motion for Summary Judgment (Doc. 10) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 11) be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381 et seq. (Doc. 2; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 11).

Plaintiff Maranda Johnson was twenty-eight years old when she applied for benefits on April 19, 2012, alleging that she became disabled on August 5, 2004. (Tr. 161). This application was denied on August 30, 2012. (Tr. 86-100). Johnson requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Jessica Inouye on May 16, 2013. (Tr. 34-83). Johnson, who was represented by attorney Carl Anderson, testified, as did vocational expert ("VE") James Lanier. (*Id*.). On August 16, 2013, the ALJ issued a written decision in which he found Johnson not disabled. (Tr. 14-33). On December 2, 2014, the Appeals Council denied review. (Tr. 1-6). Johnson filed for judicial review of that final decision on December 12, 2014. (Doc. 1).

**B.      Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

2

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

3

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Johnson not disabled under the Act. (Tr. 30). The ALJ found at Step One that Johnson had not engaged in substantial gainful activity since March 16, 2012, the application date. (Tr. 19). At Step Two, the ALJ concluded that Johnson had the following severe impairments: "seizures, left plantar fasciitis, obesity, and depression." (*Id.*). At Step Three, the ALJ found that Johnson's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 20). The ALJ then found that Johnson had the residual functional capacity ("RFC") to perform light work, except that Johnson

4

> Can engage in occasional postural activities but no climbing of ladders, ropes, and scaffoldings. [sic] The claimant cannot be required to engage in bilateral foot controls. Further, the claimant should avoid all hazards of unprotected heights, moving dangerous machinery, and no commercial driving. The claimant should avoid concentrated exposure to extreme temperatures and pulmonary irritants. This work should be unskilled.

(Tr. 21-28). At Step Four, the ALJ noted that Johnson has no past relevant work. (Tr. 28). At Step Five, the ALJ found that a significant number of jobs exist which Johnson could perform despite her limitations. (Tr. 28-29). As a result, the ALJ found Johnson not disabled under the Act. (Tr. 30).

### E.    Administrative Record

### 1.    Medical Evidence

Johnson's medical record contains only one record produced by a treating physician, and the balance of the record is comprised of consultative examinations. Her first record was created at an August 16, 2008, request for a mental status examination with Doctor of Psychology Nick Boneff. (Tr. 215-18). Dr. Boneff recorded that Johnson, then twenty-four years old, alleged "disability secondary to a seizure disorder with an onset in 2004," accompanied by migraines. (Tr. 215). Johnson stated that her seizures result in "a period of unresponsiveness, urinary incontinence, biting of the tongue, and right sided-numbness." (*Id.*). She also stated that the severity and frequency of her seizures mandated that she "never [be] left alone," and required assistance from her family to perform all household chores. (*Id.*). On examination, Dr. Boneff found that Johnson was appropriately groomed and clothed, but that her speech was "extremely slow, at times mildly slurred and mumbled" but was "generally understandable; he further noted that her "gait was also markedly slow and there was a

significant and overall psychomotor retardation" with "very poor eye contact" and a general sense of being "preoccupied and anxious." (Tr. 216). Johnson was "tearful several times during the exam" and admitted to thoughts of dying but said she would "never try" to commit suicide. (*Id*.). Dr. Boneff surmised that Johnson "did not appear to be malingering or exaggerating her symptoms," and noted that she was "clearly despondent." (*Id*.). Her stream of mental activity was "very disorganized, [and] at times confused;" her affect was "constricted, [but] generally appropriate to the content of the interview;" her mood was "mildly anxious, and very depressed," she was oriented to place, but did not know the current year and "struggled to recall the birthdates of her children and very slowly recalled the name of the current president." (Tr. 216-17). Tests of Johnson's memory, ability to process calculations, and abstract thinking showed substantial impairment. (Tr. 217). Dr. Boneff diagnosed "cognitive disorder secondary to seizures, traumatic brain injury," assigned a Global Assessment Functioning ("GAF") score of 45,[1] stated that Johnson was unable to "manage her own funds at this time," and noted that his prognosis was "very guarded." (Tr. 217-18).

On September 30, 2008, Johnson underwent a physical assessment at the hands of Dr. Cynthia Shelby-Lane. (Tr. 220-23). Johnson reported that she experienced seizures two days

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. A GAF score of 45 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work). *Id*.

6

prior to the exam, had never taken medication, and had been seen by doctors but did not receive treatment. (Tr. 220). Johnson was "positive for headaches, memory problems, and dizziness," but did not suffer from blurred vision. (Tr. 221). She was oriented to time, place, and person, and responded to questions "fairly well." (*Id.*). Dr. Shelby-Lane noted a history of hypothyroidism without treatment, hypertension, and obesity. (Tr. 223). Dr. Shelby-Lane thus drafted the following RFC assessment:

> Based upon the exam, the examinee is able to occasionally lift 20 pounds. She is able to stand or walk six hours in an eight hour [workday] with normal breaks. She is able to sit about six hours in an eight hour day. She has no limitations in upper or lower extremities. With respect to postural limitations, she is able to occasionally climb, balance, stoop, kneel, crouch and crawl. She has no established manipulative, visual or communicative limitations. She should avoid concentrated exposure to extreme cold and heat as well as fumes, odors and hazardous machinery and heights due to her previous history of seizures.

(*Id.*). Dr. Shelby-Lane also appears to have conducted an examination of Johnson's range of motion, finding that she was fully within normal limits. (Tr. 225). Similarly, Dr. Shelby-Lane found that Johnson's abilities to perform simple activities like standing, bending, walking, and opening doors was totally normal, as were her reflexes. (Tr. 226-227).

On December 5, 2011, Johnson was seen by Clinical Neuropsychologist Dr. Kenneth McCoy for an assessment of her mental abilities. (Tr. 229-34). Johnson alleged that she suffered from "severe memory problems" since experiencing toxemia during pregnancy. (Tr. 229). She was taking Prozac, Depakote, and Tylenol to treat her maladies, and had recently begun outpatient counseling for her psychological issues. (*Id.*). Johnson rated her depression at eight out of ten, and reported racing thoughts, worrying, and occasional panic attacks. (Tr.

7

230). Dr. McCoy noted that Johnson was unable or unwilling to respond to questions about her past, "seemed disinterested in the testing process and gave up easily on all tasks." (*Id*.). Johnson's mood was depressed and her affect was flat; her speech was low and muffled; she appeared mildly confused; her thought processes were logical; and she did not seem distractible. (*Id*.). Johnson was again oriented times three, could count four digits forward and two backward, but had difficulty counting numbers backwards. (*Id*.). She was able to recall only one of four objects ten minutes after they were presented. (*Id*.). Testing of her judgment, fund of information, remote memory, and ability to perform calculations were generally normal. (Tr. 231). Johnson reported that she has significant trouble with home chores, but could complete self-care tasks. (*Id*.). Dr. McCoy concluded that Johnson's "depression, attention problems, and memory problems may interfere" with completing simple, repetitive tasks for a two-hour period. (*Id*.). Dr. McCoy noted that "[b]ased on the test results she would need much supervision," but cast doubt on the accuracy of those results, noting that "it is not clear that the test results are valid," apparently because of the lack of effort Johnson contributed to the test. (*Id*.). Based on the administration of the Wechsler Memory Scale, Dr. McCoy found that Johnson's memory fell within the impaired range, yielding a score of sixty-nine. (Tr. 232). Dr. McCoy assigned a GAF score of 65[2], indicating mild symptoms, and again cautioned that "it is important to note that [Johnson] did not seem to put forth her best effort," and further noted that "[t]he obtained scores would be unusual given that she cares for three children. Her performance is believed to be an under-estimation of her true abilities."(Tr. 233).

---

[2] A GAF score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

8

On July 24, 2012, Johnson again visited Dr. Cynthia Shelby-Lane for an evaluation of her physical health. (Tr. 235-38). Johnson again complained of seizures, migraines, memory issues, hypertension, and also complained of hand and leg swelling. (Tr. 235). Johnson reported taking water pills, Depakote, Xanax, and Prozac. (*Id*.). Johnson reported that her last seizure occurred in 2011, and that they most often occurred in her sleep. (*Id*.). Johnson complained of migraines several times per week, which are alleviated by lying down. (*Id*.). Johnson asserted that she suffers from short-term memory loss, and Dr. Shelby-Lane noted that she "is very slow and vague in giving answers" and "is a fairly poor historian." (Tr. 236). Dr. Shelby-Lane's physical examination returned largely nominal results, and in her medical source statement noted that Johnson "would benefit form a weight-reduction program . . . . She does apparently need ongoing mental health care as well. She should avoid operating foot and leg controls and motorized equipment." (Tr. 237). Dr. Shelby-Lane also found Johnson's flexibility and postural abilities (*e.g.* bending, standing) to be in generally normal condition, unchanged from her prior visit. (Tr. 239-242).

On July 24, 2012, Johnson visited with Dr. Atul Shah for a psychological assessment. (Tr. 243-46). Johnson complained that "her depression has been getting progressively worse for the last couple of years," and that "[s]he stays by herself and is isolative and aloof," and has no motivation. (Tr. 243). She also asserted experiencing feelings of worthlessness and helplessness, along with some thoughts of suicide, but without any intent to commit suicide. (*Id*.). Johnson also complained for the first time of "hearing her auntie talking to her, tell[ing] her bad things off and on lasting a few minutes for the last few years" in addition to seeing "people smoking in her house when nobody is there" and "shadows for a few minutes

9

especially in the night," and "feel[ing] like people are watching her, [are] against her, and not helping her." (*Id.*). She also complained of racing thoughts, getting angry easily, and anxiety for five to fifteen minutes on either several occasions per week or per month, a number which was left uncertain in Dr. Shah's report. (*Id.*). She also reported that her anxiety is worse in crowded, stressful situations, and that she feels better when she is alone. (*Id.*). Dr. Shah observed that Johnson experienced occasional crying spells while describing her condition, had decreased eye contact, but normal gait; she had good contact with reality, fair insight, and was relaxed. (Tr. 244). Dr. Shah noted that Johnson "has a tendency to minimize symptoms," apparently suggesting that she did not tend to exaggerate her symptoms. (*Id.*). Johnson's speech was spontaneous, but was slow and quiet. (*Id.*). Johnson was oriented times three; tests of Johnson's mental activity produced normal results in terms of memory, production of information, and judgment. (Tr. 245). Johnson produced abnormal results in terms of calculations, wherein she was unable to perform simple arithmetic; abstract thinking, wherein she could not decipher the meaning of "the grass is greener on the other side" or "don't cry over spilled milk;" and was able to discuss the similarities, but not the differences, between trees and bushes. (Tr. 245). Dr. Shah concluded that Johnson has "major depressive disorder, recurrent with psychotic features which has [sic] been partially treatment [sic]. She also has panic disorder with [sic] interferes with her ability to intact [sic] with [others.]" (*Id.*). Despite these somewhat dire findings, Dr. Shah issued a GAF score of 65, indicating mild symptoms, and noted that Johnson's prognosis was fair. (Tr. 246).

Johnson's sole medical record produced by a treating physician results from an August 14, 2012 visit to Botsford Hospital. (Tr. 247). Johnson complained that she may have had a

seizure the night before, and was "seeing stars." (*Id.*). Upon induction to the hospital, Johnson was found to be oriented times three and was speaking coherently. (*Id.*). D.O. Jacklyn McParlane examined Johnson, and found no cardiac, respiratory, or neurological issues. (Tr. 250). Johnson also complained of some swelling in her feet, but an x-ray returned normal. (Tr. 258). She was diagnosed with "[s]eizure due to subtherapeutic anticonvulsant therapy, plantar fascitis [sic], [and] pain – joint, foot, left." (Tr. 262). Johnson was prescribed Tylenol and discharged in "satisfactory" condition. (Tr. 259).

### 2.    Application Reports and Administrative Hearing

#### a.    Johnson's Function Report

Johnson completed a function report on June 26, 2012. (Tr. 187-94). She asserted that her ability to work is degraded by memory issues, headaches, swollen feet and hands, difficulty standing and walking for long periods, and foot pain. (Tr. 187). She described her daily activities as focusing around trying "to rember [sic] what [I] have to do for that day but my mind is blank when I wake up in the morning," and preparing her children to go to school. (Tr. 188). She asserted that she relies on her mother for help remembering. (*Id.*). She further asserted that her sleep is sometimes interrupted because she "feel[s] like [she is] going to have a seizure and wake[s] up." (*Id.*). She also asserted that she experiences difficulty getting dressed, bathing, taking care of her hair, taking medication, and eating because she forgets to do these activities. (*Id.*). However, Johnson also said she does her shopping in stores with her mother, and is able to go shopping "all day." (Tr. 190).

Regarding the preparation of meals, Johnson said she "make[s] microwave dinners or cereal," and that such preparation takes one to two hours. (Tr. 189). However, in response to a

question asking whether her cooking abilities have changed due to her illness, Johnson quizzically said "yea I can cook on the stove and not burn food." (*Id.*). Regarding chores, Johnson said only that she cleans dishes, and experiences foot pain when doing so. (*Id.*). Johnson also unclearly stated that she goes outside "about 3 times," without indicating whether this was per day, per week, or over the course of some other period of time. (Tr. 190). Johnson said she cannot go out alone because she gets lost or forgets where she's going. (*Id.*).

Regarding hobbies, Johnson said that she "tr[ies] puzzles or tr[ies] to read books or whatch [sic] tv," and that she does these activities "all day." (Tr. 191). For social activities, Johnson wrote that she watches her children play card and board games, and attends church. (*Id.*). In terms of social interactions, Johnson asserted that she sometimes feels angry, and that her friends "say I'm different a lot." (Tr. 192).

In terms of her physical and mental abilities, Johnson said she can walk for fifteen to twenty minutes, and requires a twenty minute rest between sessions. (Tr. 192). She can pay attention for "about a few minutes," and wrote that she does not finish what she starts. (*Id.*). She also wrote that "it's hard to understand" written instructions, but can understand oral instructions "if repeat[ed] to me." (*Id.*). Johnson also asserted that she does not handle changes in routine well, and sometimes experiences anxiety attacks. (Tr. 193).

### b.    Johnson's Testimony at the Administrative Hearing

At the May 16, 2013, hearing before the ALJ, Johnson asserted that she lives at home with her three children, and completed the eleventh grade, but did not graduate. (Tr. 42-43). She asserted that she has experienced difficulty with mathematics and reading since the onset of her seizures. (Tr. 43). However, when questioned by the ALJ, Johnson confirmed that she

could read a simple grocery list and obtain those items from a store. (Tr. 43-44). Johnson also noted that she receives help from her mother to perform shopping and household cleaning tasks, but that she sometimes joins in completing those tasks. (Tr. 52). Johnson also claimed that she "sometimes" needs help performing personal tasks like bathing and getting dressed, when she is "in a lot of pain." (Tr. 52-53). Johnson also asserted that she helps take care of her children, including setting out their clothing, ensuring that they get ready for school, and sometimes assists them with their homework. (Tr. 52-54).

Johnson testified that she does not drive, and is unwilling to take public transportation because she "got lost." (Tr. 44). Johnson also testified that she last worked in "2000 or 2001," several years before the alleged onset of her disability. (Tr. 45). She asserted that she attempted to find other work, but "forgot [her] interview." (Tr. 46). Johnson stated that she was "not good at all" with remembering dates or appointments, and frequently forgets to take her medication unless reminded. (*Id.*). Johnson confirmed that she cooks for her family, but when asked whether she sometimes burns food on the stove because of memory deficiencies, she unclearly responded "I microwave stuff." (Tr. 47). When asked which medical issue has the biggest impact on her ability to work, Johnson responded "my mind going blank, like not remembering things." (*Id.*). Johnson testified that she experiences migraines "a few times a week," and that over the counter medication is ineffective at resolving that pain. (*Id.*). Johnson also stated that for several years she has experienced numbness and a burning sensation in her feet. (*Id.*). Regarding seizures, Johnson stated that she sometimes forgets that they have occurred because her "mind just goes blank," followed by dizziness and "seeing stars," which lasts for up to an hour. (Tr. 48, 65). She claimed that in the prior year she experienced "eight or nine" seizures.

13

(Tr. 65). However, she also testified that to her knowledge she had not experienced a seizure in the past five months. (Tr. 48). Johnson then unaccountably asserted that she experienced eight or nine seizures in the month prior to the hearing. (Tr. 67). Johnson also asserted that she recently began taking Xanax and Prozac, which reduced the number of headaches, caused her to feel "not, like, real sad about not remembering stuff," or in other words helped to ameliorate her depression. (*Id.*). She further testified that she experiences migraines which prevent her from getting out of bed approximately three times per week. (Tr. 51).

Regarding hallucinations, Johnson asserted that she sees "dead relatives," on rare occasions, including a few months prior to the hearing, but that her medication also helped to reduce this phenomenon. (Tr. 49-50). Johnson asserted that her legs "burn" if she sits or stands for twenty minutes or more, and that she is unable to walk a full block without rest. (Tr. 50-51). Johnson also claimed that she could not lift a gallon of milk in each hand. (Tr. 51).

Regarding hobbies, Johnson stated that she "sometimes" watches television, tries to teach herself to "read better," reads magazines, goes to the park, and attends church. (Tr. 54-56). Johnson confirmed that she does not know "a lot" about computers, and does not know how to type. (Tr. 55-57). When asked whether she could perform work answering telephones, Johnson confirmed that she probably could. (Tr. 57).

### c.      The VE's Testimony at the Administrative Hearing

The ALJ then asked the VE a series of questions to determine Johnson's ability to perform work. (Tr. 79-82). The ALJ asked the VE to consider whether a hypothetical worker, who has the same education, age, and past work experience as Johnson could perform

competitive work. (Tr. 64). Specifically, the ALJ asked the VE to hypothesize a person who has the ability to perform light work, and who is limited in the following manner:

> This individual can engage in occasional postural activities, but no climbing of ladders, ropes, and scaffolding. This individual cannot be required to engage in bilateral foot controls, should avoid all hazards of unprotected heights, moving dangerous machinery, and no commercial driving. This individual should avoid concentrated exposure to extreme temperatures and pulmonary irritants, and the work should be unskilled.

(Tr. 79-80). The VE confirmed that such a worker could perform work as a collator operator (2,888 jobs in the state of Michigan), routing clerk (2,442 jobs), and bench assembler (2,010 jobs). (Tr. 80). The ALJ then further restricted the hypothetical worker's abilities, including that the work must be comprised of "simple, routine, and repetitive tasks, and that the job tasks not require the performance of math skills or extensive reading" such that the worker would not be required to "read chapters in a book." (Tr. 80-81). The VE confirmed that the worker could perform the same jobs listed in response to the first hypothetical. (Tr. 81). Finally, the ALJ asked whether an individual who is absent two to three days per month or who is off task fifteen to twenty percent of the time could find competitive work; the VE testified that either restriction would preclude competitive work. (Tr. 81).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost

any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and

are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record

and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL

374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

19

### G.    Analysis

Johnson argues that the ALJ committed reversible error in the following ways: (1) erroneously granting weight to incomplete opinions drafted by the consultative state examiners; (2) erroneously failing to assess Johnson's psychological status pursuant to the sequential evaluation process established by Social Security Rules ("SSR") 96-8p and 85-15; (3) erroneously concluding that Johnson's ability to take care of her children rendered her capable of performing competitive employment; (4) failing to discuss Johnson's memory and reading issues; (5) contradictorily finding that Johnson suffered from "severe" mental impairments, but later finding that those same impairments were only "moderate" or "mild;" (6) considering improper factors in drafting Johnson's RFC assessment."[3] These arguments will be addressed in turn.

### 1.    *The ALJ Did Not Err by Relying upon Incomplete Opinions from Drs. Mahmood and Yousuf*

First, Johnson argues that the ALJ erred by relying upon the opinions of consultative examiners Dr. Tariq Mahmood and Dr. Yousuf, which she asserts were incomplete, thus leaving the ALJ's findings improperly supported. (Doc. 10 at 9-12). Johnson asserts that Dr. Yousuf "did not form an opinion as to Plaintiff's ability to: understand, carry out and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work

---

[3] The arguments in Johnson's brief are not clearly distinguished, and one line of argumentation frequently rolls into another. The Court will endeavor to address these arguments separately and in full. If the Court fails, in Johnson's estimation, to address each of her sub-arguments as fully as she would like, it notes that issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" are deemed waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997).

setting." (*Id*. at 10). A reading of Dr. Yousuf's opinion shows that he specifically analyzed each of these areas of functioning, and found that Johnson was "not significantly limited" in terms of remembering and carrying out "very short and simple instructions," making work-related decisions, sustaining an ordinary routine without special supervision, working in coordination or in proximity to others without being distracted by them. (Tr. 96). He also found that Johnson was moderately limited in terms of completing a normal workday without interruptions from psychologically based symptoms, and moderately limited in terms of carrying out detailed instructions. (Tr. 96). Johnson's contention that Dr. Yousuf rendered an incomplete opinion is thus without merit.

Similarly, Johnson asserts that Dr. Mahmood did not "consider each [physical area of] function separately or even address her ability to carry, push and/or pull." (Doc. 10 at 11). This too is false; Dr. Mahmood properly evaluated each of Johnson's exertional and non-exertional limitations, and found that Johnson retains "unlimited, other than shown" pushing and pulling ability, and found that she could lift and or carry twenty pounds occasionally, and ten pounds frequently. (Tr. 94).

### 2.    *The ALJ Did Not Err by Failing to Comply with SSR 96-8p and 85-15*

Johnson next asserts that the ALJ failed to "address the work-related activities in the opinion by citing the medical evidence to support each finding," and thus failed in her obligations under SSR 96-8p and 85-15. (Doc. 10 at 9-12). Specifically, Johnson argues that the ALJ should have considered her ability to use judgment in the workplace, respond to work situations and co-workers, and deal with changes in work setting. (*Id*. at 9). As Defendant notes in its brief, Sixth Circuit precedent clearly establishes that "[a]lthough a function-by-

21

function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (quotation omitted). Furthermore, an ALJ is not required to include in her RFC assessment any limitations which she does not find credible. *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993); *Sumner v. Comm'r of Soc. Sec.*, No. 13-14303, 2014 WL 6809891, at *9 (E.D. Mich. Dec. 2, 2014) (rejecting a similar argument proffered by the attorney representing Johnson in this matter). The ALJ, citing discrepancies between the medical evidence and Johnson's testimony, properly concluded that Johnson's assertions regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. 19-28). The ALJ also properly stated that she considered the entire record. (Tr. 19). Moreover, the ALJ explicitly opined as to Johnson's mental limitations in the categories of concentration, persistence, or pace; social functioning; and daily activities. (Tr. 20-21). Finally, SSR 85-15 does not apply to cases where both exertional and non-exertional impairments are alleged, and in this case Johnson has alleged that she is disabled by both. *See Doneworth v. Shalala*, 76 F.3d 378 *4 (6th Cir.1996); *Rosenkranz v. Comm'r of Soc., Sec. Admin.*, No. 1:13-CV-00535, 2014 WL 1270588, at *6 (N.D. Ohio Mar. 26, 2014).

> 3. *The ALJ Did Not Err by Issuing an Insufficiently Restrictive RFC Assessment*

Next, Johnson argues that the ALJ erred by "severely over-estimat[ing]" her ability to work, because "despite being able to take care for [sic] children, testimony from the Plaintiff, in addition to medical evidence, clearly showed that she cannot cook for herself, or take her required medication without assistance." (Doc. 10 at 9-10). To the contrary, the record is at best unclear with regard to her cooking abilities, and at worst demonstrates that she can prepare

22

food. In her function report, Johnson responded to a question regarding the sort of food she prepares by writing "I make microwave dinners or cereal." (Tr. 189). In response to a question inquiring as to how her illnesses have changed her cooking habits, she responded by writing "yea I can cook on the stove and not burn food." (*Id.*). It is difficult to believe that Johnson intended to convey that her illnesses have improved her cooking abilities, but neither does her statement convey that she lacks the ability to use a stove. This matter was not clarified by Johnson's statements at the hearing before the ALJ, where she responded to a question about her ability to use a stove with the phrase "I microwave stuff." (Tr. 46).

However, Johnson's cooking abilities are ultimately only meaningful insofar as they demonstrate whether she retains sufficient memory and cognitive functioning to perform competitive, remunerative work. *See* 20 C.F.R. § 404.1520a(d)(1) (noting that an impairment may be found not severe if the claimant's degree of limitation is rated at "none" or "mild" in activities of daily living, social functioning, and concentration, persistence, or pace). Johnson's medical records further discredit her asserted degree of limitation. Johnson's 2008 mental status examination with Dr. Boneff showed "substantial impairment," she was diagnosed with a cognitive disorder secondary to seizures and traumatic brain injury, and she was assigned a GAF score of 45. (Tr. 216-17). The ALJ quite reasonably noted that these findings were inconsistent with Johnson's activities of daily living and other medical evidence, and assigned no weight to Dr. Boneff's findings. (Tr. 26). Johnson's 2011 mental exam with Dr. McCoy similarly showed memory and cognitive impairment, but Dr. McCoy cast doubt on the results, noting that Johnson did not put effort into the tests, and that her ability to care for her three children was inconsistent with her allegedly severe mental limitations; she assigned a GAF

23

score of 65, indicating mild symptoms. (Tr. 231-33). The ALJ assigned limited weight to these findings given Dr. McCoy's own stated belief that the results may have been invalid. (Tr. 26). Johnson's 2012 visit with Dr. Shah resulted in the diagnosis of major depressive disorder and panic disorder, but Dr. Shah ultimately assessed another GAF score of 65, indicating mild symptoms. (Tr. 246). Objective medical evidence thus does not comport with Johnson's allegations of severe, disabling memory and cognitive function issues.

Johnson's counsel also confirmed that she had not visited with a treating physician in 2012, but began seeing one in 2013 for the treatment of boils, and that said physician began issuing anti-seizure medication; no records from that physician appear in the record. (Tr. 38-39). The total, unexplained lack of treatment notes in the medical record further suggests that Johnson's maladies are not as severe as she asserts. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (holding that a failure to seek treatment "may cast doubt on a claimant's complaints of disabling symptoms).

Finally, as the ALJ properly noted, there are substantial reasons to question the accuracy of Johnson's asserted limitations, including inconsistency between her ability to take care of her three children and asserted inability to remember tasks, perform self-care activities, and sit or stand for extended periods. (Tr. 27). The ALJ also properly noted the substantial variation in Johnson's recollection of when she experienced seizures, further undercutting the credibility of her asserted limitations. (Tr. 28). The ALJ thus provided substantial justifications for discrediting Johnson's asserted limitations and rendering a less restrictive RFC assessment.

        4.    *The ALJ Did Not Fail to Consider Johnson's Reading and Memory Limitations*

24

Johnson asserts that the ALJ erred because the RFC she assessed "does not take into account Plaintiff's severe memory problems or inability to understand written instructions." (Doc. 10 at 8). In support of these limitations, Johnson cites her own testimony presented at the hearing before the ALJ. (*Id.*). As noted *supra*, the ALJ thoroughly considered Johnson's memory issues, and found that her allegations were not well supported by the medical evidence of record. Regarding her ability to understand written instructions, Johnson testified that she is teaching herself "how to read better," and in response to a query regarding whether she "reads much," Johnson testified that she "tries to." (Tr. 54-55). Johnson also testified that she has some knowledge of how to operate a computer, and that she would be capable of performing work involving answering phones and taking messages. (Tr. 57). The ALJ specifically queried the VE regarding whether a hypothetical worker with Johnson's limitations could perform remunerative, competitive work which required "very basic reading," including "reading and completing forms," but which would not include reading "chapters in a book," and the VE testified that such a restriction would be work preclusive. (Tr. 81). Johnson's own testimony thus demonstrates that she is capable of performing the jobs identified by the ALJ. Further, the ALJ gave great weight to the assessment drafted by Dr. Yousuf, who found that Johnson does not suffer from understanding or memory limitations, further suggesting that she is capable of the sort of basic reading comprehension necessary to perform the job positions identified by the VE. (Tr. 96). The ALJ thus properly addressed Johnson's alleged reading and memory limitations, and provided for an appropriate level of restriction in her RFC assessment.

     *5.*     *The ALJ Did Not Err by Rendering Contradictory Mental Health Findings*

Johnson next argues that the ALJ erred by finding that she suffered from "severe" mental impairments, which is allegedly inconsistent with the ALJ's finding that she suffered from "severe" mental impairments, but later finding that she suffered from only "mild" or "moderate" mental impairments. (Doc. 10 at 13-15). This argument misconstrues both the rules governing the ALJ's decision and the content of this ALJ's decision. It is true that a finding of "none" or "mild" limitation in the first three areas of mental functioning referenced in 20 C.F.R. § 404.1520a(d)(1) will generally result in a finding that the claimant does not have a severe mental impairment. However, in this case, the ALJ found that Johnson experiences mild restrictions in the areas of activities of daily living and concentration, persistence, or pace, but experiences *moderate* difficulties in terms of social functioning, thus the ALJ's decision comports perfectly with the requirements of § 404.1520a. (Tr. 20-21). It is thus entirely appropriate for the ALJ to find that Johnson suffers from a "severe" mental impairment, but to simultaneously find that she experiences either mild or moderate limitations in the three relevant areas of mental functioning.

### 6.    *The ALJ Did Not Err by Improperly Analyzing Johnson's RFC*

Finally, Johnson contends that the ALJ erred by improperly analyzing her RFC through the use of the factors listed in 20 C.F.R. § 404.1520(a), including social functioning; concentration, persistence, or pace; and activities of daily living, which Johnson alleges "are part of the Psychiatric Review Technique evaluation and are *not* used to assess a claimant's RFC." (Doc. 10 at 12) (emphasis original). However, the areas of functioning set forth in § 404.1520(a) may form a basis for a RFC determination. The Social Security rules hold that

26

> RFC is a multidimensional description of the work-related abilities you retain in spite of your medical impairments. An assessment of your RFC complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders when your impairment(s) is severe but neither meets nor is equivalent in severity to a listed mental disorder.

20 C.F.R. § Pt. 404, Subpt. P, App. 1. Johnson also cites the ALJ's statement that "the following [RFC] assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis'" (Tr. 21; Doc. 10 at 13), apparently in the belief that the ALJ's RFC analysis was comprised *exclusively* of these paragraph B criteria. In reality, the ALJ's RFC analysis included consideration of "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (Tr. 21), and included a lengthy discussion of Johnson's asserted limitations, medical evidence, Johnson's credibility, and other relevant information. (Tr. 21-28). 20 C.F.R. § 404.1545(a)(2) requires that an ALJ evaluate the RFC in light of "all the relevant evidence in [the] case record," and the ALJ's discussion here is more than sufficient to satisfy that requirement.

In sum, the ALJ properly considered Johnson's alleged limitations in light of the objective medical evidence and other relevant material. She properly discounted Johnson's allegations, and gave good reasons for the weight she granted to the opinions of state consultative examiners Drs. Mahmood and Yousuf. She properly rendered the RFC assessment, and, through the use of the VE, found that Johnson can still perform a significant number of available jobs. For these reasons, the Court finds that the ALJ's decision was supported by substantial evidence.

**H.      Conclusion**

For the reasons stated above, the Court **RECOMMENDS** that Johnson's Motion for Summary Judgment (Doc. 10) be **DENIED**, the Commissioner's Motion (Doc. 11) be **GRANTED**, and that this case be **AFFIRMED**.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P.

72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 18, 2015                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 18, 2015                    By s/Kristen Krawczyk
                                            Case Manager to Magistrate Judge Morris